Arthur D. Dyer, Russell Moeller, Vern Moeller, Anthony Vitrano, Betty Vitrano, Thomas Vitrano, and Renee Vitrano, Plaintiffs-Appellants,†

v.

Blackhawk Leather LLC, Transportation Technologies Industries Inc., E Z Paintr, Litton Systems Inc., and Ispat Inland Mortgage Acceptance Corporation, Defendants-Respondents,

Waste Management of Wisconsin, Inc. and Muskego Site Groundwater Remediation Group, Defendants.

Waste Management of Wisconsin, Inc., Plaintiff-Respondent,

v.

Russell Moeller, Defendant-Appellant.

Court of Appeals

No. 2007AP1400. Submitted on briefs May 15, 2008.
—Decided July 30, 2008.

2008 WI App 128

(Also reported in 758 N.W.2d 167.)

† Petition to review denied.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Mark L. Thomsen, Sarah F. Kaas,* and *Charles David Schmidt of Cannon & Dunphy, S.C.* of Brookfield and *Dennis M. Grzezinski* of *Dennis Grzezinski Law Office* of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Thomas P. Lyons* of *Lyons & Ranta, LLP* of Brookfield, *Jennifer T. Nijman,* Esq. of *Winston & Strawn* of Chicago, Illinois, and assistant general counsel for Waste Management, Inc., *Steven M. Morgan,* Esq. of Houston, Texas.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. BROWN, C.J. This lawsuit concerns a now-closed landfill in Muskego. The plaintiffs are nearby landowners whose water is contaminated with a toxic chemical called vinyl chloride, which they allege came from the landfill. Their suit against Waste Management of Wisconsin, Inc., the landfill's operator, is still pending in the circuit court, and is not before us in this appeal. Rather, this is the plaintiffs' appeal of the circuit court's summary judgment dismissing a group of defendants known as "the Generators." These are businesses that, at various times, generated waste that was dumped at the landfill. The trial court dismissed the Generators

because it concluded that the plaintiffs failed to present any evidence linking the Generators' actions to the vinyl chloride in the plaintiffs' water. We affirm because we likewise conclude that the plaintiffs have failed to present any evidence that would create a genuine issue of material fact for a jury to decide. A case founded only on hunches and speculation, rather than evidence, will not justify holding a trial. The plaintiffs also appeal certain evidentiary rulings and the dismissal of peripheral claims. We affirm these issues as well for the reasons that follow.

## Factual and Procedural Background

¶ 2. This case was litigated for more than five years in the circuit court before this appeal, and has generated a prodigious record. There are many disputed facts and to explain why there are no *genuine* issues of *material* fact, we will need to present more detail than we ordinarily would in a summary judgment appeal. The original permit for a dump on the site in question was issued in 1954. Waste Management (or its corporate predecessor) began leasing and operating the Muskego landfill in or around 1969. In 1975, the Wisconsin Department of Natural Resources, concerned with the landfill's effect on groundwater, ordered Waste Management to submit a final abandonment plan for portions of the landfill. In 1980, the last remaining portion of the landfill was closed. The plaintiffs allege that during the time Waste Management operated the landfill, it accepted liquid, toxic, and hazardous waste for disposal at the landfill, in violation of its permits.

¶ 3. After the closure, the state DNR continued to investigate and monitor the landfill and, in 1985, the

federal Environmental Protection Agency added the site to the National Priorities List, bringing it within the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). *See* 42 U.S.C.A. § 9601–9675 (West 2008). CERCLA requires potentially responsible parties (PRPs) to conduct cleanup or pay for the cleanup performed by others. *See Johnson Controls, Inc. v. Employer's Ins. of Wausau*, 2003 WI 108, ¶ 5 n.4, 264 Wis. 2d 60, 665 N.W.2d 257. PRPs include those who disposed of their hazardous substances at the facility in question. *See* 42 U.S.C.A. § 9607(a)(3) (West 2006). The EPA identifies the PRPs at each site, negotiates with PRPs to do the cleanup, and recovers from PRPs the cleanup costs spent by the EPA. *Johnson Controls*, 264 Wis. 2d 60, ¶ 5 n.4.

¶ 4. Additionally, one PRP has a statutory right to seek contribution from other parties that contributed to the contamination. *See* 42 U.S.C.A. § 9613(f)(1) (West 2008). In 1986, the EPA requested information from Waste Management about sources of the waste in the landfill, and in response Waste Management identified numerous companies, including the Generators. The Generators (along with other parties not a part of this suit) therefore formed a group to oppose Waste Management's effort to seek contribution for cleanup costs. This group ultimately reached a mediated agreement with Waste Management allocating these costs between the parties. This agreement resulted in Waste Management, the Generators, and other parties forming the Muskego Site Groundwater Remediation Group (MSGRG) in 1996.

¶ 5. In late 1997 and early 1998, the DNR collected water samples from the wells of Dyer, the Moellers and the Vitranos and detected levels of vinyl chloride exceeding state and federal drinking water

standards. The DNR notified the landowners of the results and advised them to use bottled water for drinking and cooking. Along with the notification letters, the DNR enclosed a fact sheet about vinyl chloride which stated that "[e]xposure to vinyl chloride may increase a person's risk of developing cancer. Human and animal studies have shown higher rates of liver, lung and several other types of cancer." Immediately after the test results, MSGRG provided bottled water to the affected landowners and, in 1999, it paid for their residences to be connected to the municipal water supply.

¶ 6. In 2001, Dyer, the Moellers, and the Vitranos sued Waste Management, MSGRG, and the Generators for contamination of their groundwater. They alleged claims of negligence, trespass, and nuisance, and among other damages requested compensation for their fear of developing cancer. Ultimately, in 2007, the circuit court granted summary judgment dismissing the individual Generators (though not Waste Management or MSGRG) from the case. This appeal followed.

## Attorney-Client and Mediation Privileges

¶ 7. Before we address the summary judgment at the heart of this appeal, we will consider two evidentiary rulings also appealed by the plaintiffs. In the first, the trial court excluded a 1986 memorandum sent by an in-house Waste Management attorney to several managers and attorneys at Waste Management or its corporate parent. The circuit court excluded this memo because it held it subject to the attorney-client privilege.[1] The

---

[1] The Generators contend that the exclusion of the memo is not properly before us as the evidence involved is relevant only to the claims against Waste Management, which are still pending in the circuit court. We disagree. The Plaintiffs' theory

second ruling concerns documents generated during the mediation process between Waste Management and the Generators (the "allocation documents"). The circuit court concluded that these documents are subject to both state and federal mediation privileges. We have reviewed the memorandum and those portions of the mediation documents to which the parties have referred us. We affirm both rulings for reasons we will now give, though we may be hampered a bit by our effort not to publicize the contents of these confidential documents.

■■■■■

¶ 8. First, the memo. WISCONSIN STAT. § 905.03(2) gives to a lawyer's client "a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." The party asserting the privilege has the burden to show that it applies. *State v. Meeks,* 2003 WI 104, ¶ 20, 263 Wis. 2d 794, 666 N.W.2d 859. Because the privilege is "an obstacle to the investigation of the truth" we construe it strictly and narrowly. *Id.* (citation omitted).

---

of the Generators' liability, as we will discuss below, depends in part upon the Generators having failed to remediate the contamination of the landfill. Plaintiffs allege that the Generators adopted the policy that Plaintiffs see reflected in the excluded memo. The memo's admissibility is thus properly before us as a prior nonfinal ruling adverse to appellants and favorable to respondents. *See* WIS. STAT. § 809.10(4) (2005–06). (This stands in contrast with the circuit court's dismissal of Moeller's abuse of process claim against Waste Management, which is unconnected with the respondents and is thus not properly before us, as we discuss below.)

All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

¶ 9. There is no dispute that the memo here at issue was a communication from an attorney to a client. However, the plaintiffs argue that there is no evidence that the memo was communicated "for the purpose of facilitating the rendition of professional legal services to the client." Rather, they contend, the memo only "memorialized a business decision already made by [Waste Management]." We disagree. The memo itself provides ample evidence of its privileged nature. It notes the status of Waste Management's situation vis-à-vis the Wisconsin DNR—which in 1986 had already been exerting its legal authority over the landfill for more than a decade. The memo describes concerns about the landfill that the DNR had communicated to the company and describes a selected course of action in responding to the agency's concerns. The fact that this communicated course of action could be characterized as relating to the "business" of Waste Management does not mean that it is not also a communication for the purpose of rendering legal services. As the court noted, "[v]irtually all 'legal' advice involves a modicum of business advice . . . ." We have no trouble concluding that the memo constitutes a privileged attorney-client communication.

¶ 10. The plaintiffs submit, however, that Waste Management waived any privilege attached to the memo by disclosing it in response to a discovery request. Waste Management, upon realizing that it had produced the document, moved the circuit court to direct the plaintiffs to return it. Waste Management alleged that the production was inadvertent and noted that it had produced over 300 boxes of documents in the litigation. The circuit court granted Waste Management's motion and ordered the plaintiffs to return the document and destroy any

copies of it. Our supreme court held in *Harold Sampson Children's Trust v. Linda Gale Sampson 1979 Trust*, 2004 WI 57, ¶ 31, 271 Wis. 2d 610, 679 N.W.2d 794, that because the lawyer-client privilege belongs to the client, and not the lawyer, only the client can waive it. Thus, in that case, an attorney's voluntary[2] disclosure of documents that he had erroneously determined not to be privileged did not constitute waiver. *See id.*, ¶¶ 7, 31. The plaintiffs contend, however, that in this case it was the client, Waste Management, and not the lawyer that disclosed the document. We reject this contention. The plaintiffs' only factual support for it is the fact that Waste Management's assistant general counsel is listed as "Of Counsel" on the signature page of the discovery responses (as he is on other filings and on the appellate briefs in this case). The attorney did not sign the response and there is no evidence that he was involved in any way in the production of the document.

██

¶ 11. The plaintiffs further argue that the privilege was waived on three other occasions: when Waste Management filed a copy of the document as a part of its motion for the document's return in the circuit court; when it filed a copy with this court in an earlier

---

[2] The supreme court noted that the privilege waiver statute refers only to disclosures that are made "voluntarily." *Harold Sampson Children's Trust v. Linda Gale Sampson 1979 Trust*, 2004 WI 57, ¶ 27, 271 Wis. 2d 610, 679 N.W.2d 794; WIS. STAT. § 905.11. Thus, the court held that cases from other jurisdictions discussing "inadvertent disclosure" were not apposite. *Sampson*, 271 Wis. 2d 610, ¶ 28. Whether the disclosure in this case could be characterized as "voluntary" or "inadvertent," the thrust of *Sampson* is that the lawyer-client privilege is not the lawyer's to waive; this principle is sufficient to decide the case before us.

proceeding;[3] and when it turned over a copy as part of a defense expert's file. As for the two court filings, both were under seal. With respect to the expert's file, Waste Management submits, and the plaintiffs do not dispute, that the memo was in Waste Management's expert's file only because the plaintiffs had given a copy to their own expert, who then turned over his file to Waste Management, which gave it to its expert for review. All of this occurred long after the court had originally ordered the plaintiffs to return or destroy all copies of the document. Thus, this production of the memo occurred only because of the plaintiffs' failure to obey the court's order. We hold that none of these events waived the attorney-client privilege. We further order that, within thirty days of remittitur, the plaintiffs account to the circuit court for any copies of the memo that they may presently have in their possession, whether paper or electronic, including any archive or backup copies.

¶ 12. The plaintiffs also appeal the circuit court's ruling excluding the allocation documents, which were exchanged in the process of the Generators' mediation with Waste Management, as subject to a mediation privilege. Wisconsin's statutory privilege applies to "communications . . . made or presented in mediation." WIS. STAT. § 904.085(3).[4] As the Generators note, the

---

[3] *See Dyer v. Waste Mgmt. of Wis.*, No. 2006AP2396 (WI App Dec. 15, 2006) (leave to appeal denied).

[4] Some federal courts have also adopted a mediation privilege. *See, e.g., Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1170–80 (C.D. Cal. 1998); *Hays v. Equitex, Inc. (In re RDM Sports Group, Inc.)*, 277 B.R. 415, 430 (Bankr. N.D. Ga. 2002). Because we hold that Wisconsin's statutory privilege covers the allocation documents, we need not address whether our state's courts should apply this federal privilege.

special master handling discovery in this case reviewed all of the documents exchanged during the allocation process and turned over to the plaintiffs those that he deemed unprivileged. The only documents that the special master kept from the plaintiffs were those that he characterized as "documents written by lawyers and arguments by lawyers and position papers by lawyers." We take the special master's comments to mean that he withheld from the plaintiffs only those documents that were created for the mediation and thus constituted communications "made or presented in mediation," rather than pre-existing documents that were simply exchanged by the parties to the mediation. *See id.*; *Zellner v. Cedarburg School Dist.*, 2007 WI 53, ¶ 48, 300 Wis. 2d 290, 731 N.W.2d 240 (noting that the mediation exception to open records law, (which is coextensive with the evidentiary privilege, *see* § 904.085(3)(a)), does not apply to materials not "created for the purpose of mediation").[5]

¶ 13. The plaintiffs note that the mediation privilege was not enacted until 1994, after much, if not all, of the allocation mediation had already been completed. *See* S. Ct. Order 93–03, 179 Wis. 2d xv (eff. Jan. 1, 1994). They argue that the circuit court's ruling barring the production of allocation documents constitutes a retroactive application of Wis. Stat. § 904.085(3), and further that this is inappropriate because the privilege is a rule of substantive, rather than procedural, law. *See*

---

[5] The special master also spoke of having turned over to the plaintiffs all documents containing "factual information" and the plaintiffs dispute that this is so. The plaintiffs are not entitled to any documents simply because they contain "factual information"; if such documents constitute communications "made or presented in mediation," they are privileged. Wis. Stat. § 904.085(3).

*Bill's Distrib., Ltd. v. Cormican*, 2002 WI App 156,
¶¶ 9–10, 256 Wis. 2d 142, 647 N.W.2d 908.

■

¶ 14. Though all parties treat whether the media-
tion privilege applies as a question of retroactivity, we
are not convinced that retroactivity is really the issue.
The statute states that no "communication relating to a
dispute in mediation made or presented in media-
tion . . . is admissible in evidence or subject to discovery
or compulsory process in any judicial or administrative
proceeding." Wis. Stat. § 904.085(3)(a). The focus of the
statute is on the courts and on judicial proceedings: it
directs the courts not to admit certain communications
into evidence and excludes those same communications
from discovery. Thus, in our view, the statute is "ap-
plied" when the communications are sought to be
introduced or discovered in court, not when they are
originally made during mediation. The court was not
reaching backward in time to attach a rule of law to the
pre-1994 mediation; rather, it was refusing to allow
present-day discovery of mediation communications
because the statute, which was in effect at that mo-
ment, barred it.[6]

■

¶ 15. The plaintiffs argue that applying the privi-
lege in this case cannot fulfill the stated purpose of the
statute, which is to "encourage the candor and coopera-
tion of disputing parties, to the end that disputes may
be quickly, fairly and voluntarily settled." *See* Wis. Stat.
§ 904.085(3)(a). The plaintiffs are of course correct that

---

[6] *But cf. State v. Pelley*, 828 N.E.2d 915, 918–19 (Ind. 2005)
(holding that application of a new counselor/client privilege to
communications occurring before the privilege's enactment
constituted retroactive application).

we cannot "encourage . . . candor and cooperation" in mediations that have already occurred. Neither, however, does applying the privilege in any way *undermine* this goal. There is no language in the statute limiting the privilege to mediations occurring after the date of adoption. Instead, the statute gives the plain directive that "no oral or written communication . . . made or presented in mediation . . . is admissible in evidence or subject to discovery," *id.*, and we decline the invitation to negate this specific language simply because the mediation in this case predated the existence of the privilege.

■

¶ 16. The plaintiffs also note Wis. Stat. § 904.085(4)(c), which states that the privilege "does not prohibit the admission of evidence otherwise discovered, although the evidence was presented in the course of mediation." The plaintiffs contend that this provision means that certain of the allocation documents are not subject to the privilege because the plaintiffs obtained them "outside formal discovery via sources other than [Waste Management] and the Generators." We cannot condone the plaintiffs' flagrant abuse of the English language. "[O]therwise discovered" in this context quite obviously means "discovered outside of mediation," not "discovered outside the bounds of formal civil discovery." By its terms, § 904.085(4)(c) is intended to prevent a party from making pre-existing, unprivileged information privileged, simply by communicating in the course of a mediation. If the plaintiffs' reading were correct, then the mediation privilege would not apply to communications received *by a party to a mediation in the course of that mediation,* since a mediation is not formal civil discovery. Since this is precisely what the privilege is designed to protect, *see* § 904.085(1), the plaintiffs' reading is clearly wrong.

¶ 17. The plaintiffs finally argue that even if the mediation privilege applies in the first instance, the circuit court should have allowed the discovery of the allocation documents under WIS. STAT. § 904.085(4)(e), which states that a court "may admit evidence otherwise barred by this section if necessary to prevent a manifest injustice of sufficient magnitude to outweigh the importance of protecting the principle of confidentiality in mediation proceedings generally." We note that the statute states only that a court may "admit" such evidence and does not, on its face, create an exception to the rule against discovery. We further note that the use of the word "may" generally denotes a discretionary decision for the trial court. *See Liberty Grove Town Bd. v. Door County Bd. of Supervisors*, 2005 WI App 166, ¶ 10, 284 Wis. 2d 814, 702 N.W.2d 33. In any case, having reviewed the final report of the allocation mediator and considered the "facts" that the plaintiffs claim to find therein, we find no basis whatsoever for the plaintiffs' claims that the "manifest injustice" exception should apply in this case. As we have noted, the special master already sifted through the documents and provided many of them to the plaintiffs. The only documents held back were those "written by lawyers and arguments by lawyers and position papers by lawyers." Whether such documents constitute evidence of anything is questionable, but certainly they are not the sort of evidence whose denial here will work a "manifest injustice."

## Summary Judgment

¶ 18. We now turn to the central issue in this case: whether the circuit court properly granted sum-

mary judgment dismissing all of the plaintiffs' claims against the Generators. Summary judgment is proper where there are no genuine issues of material fact and one party is entitled to a judgment as a matter of law. Wis. Stat. § 802.08(2). Though the plaintiffs made trespass and nuisance claims below, they do not mention the elements of these causes of action or otherwise discuss them in any depth in their appellate briefs. As the plaintiffs do, we will address the summary judgment under the rubric of general negligence law. In Wisconsin, to establish a negligence claim, a plaintiff must prove: (1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the injury. *Kessel ex rel. Swenson v. Stansfield Vending, Inc.*, 2006 WI App 68, ¶ 15, 291 Wis. 2d 504, 714 N.W.2d 206. However, even if all the elements are proved or even if liability for negligent conduct is assumed, the court may nonetheless preclude liability based on public policy factors. *Id.*

¶ 19. All of the plaintiffs' claims against the Generators are premised on three general sets of alleged acts and omissions: (1) the Generators' dumping of "liquid, toxic, and hazardous waste" at the landfill; (2) the Generators' failure to properly investigate and remediate the contamination; and (3) the Generators' failure to warn the owners of nearby properties that the contamination existed. The circuit court granted summary judgment because it held that the plaintiffs had presented "no proof" that the Generators had dumped any waste into the landfill containing vinyl chloride or its chemical precursors. Without such evidence, there was nothing linking the Generators to the plaintiffs'

harm: that is, there was no causal connection between any alleged breach of duty on the Generators' part and the harm the plaintiffs suffered. On appeal, the plaintiffs do not exactly admit that this is correct, but they come very close. They only claim that the allocation documents, if discovered, "would provide the landowners with further discovery and evidence on each Generator's dumping in the landfill." But these documents are privileged and, as we have discussed, the plaintiffs have already received any documents that the special master determined to contain "factual information." If the plaintiffs cannot make the case with the facts, we fail to see how they will make it with "position papers by lawyers." We conclude that the negligence claims based on the Generators' dumping were properly dismissed.

¶ 20. The second theory of liability advanced by the plaintiffs is that the Generators failed to properly investigate and remediate the contamination. The plaintiffs assert that by forming MSGRG, the Generators assumed a duty to take responsive action to remedy the contamination and prevent its further spread. They cite *Nischke v. Farmers & Merchs. Bank & Trust*, 187 Wis. 2d 96, 113, 522 N.W.2d 542 (Ct. App. 1994), in which we stated that "Wisconsin has long recognized that liability may be imposed on one who, having no duty to act, gratuitously undertakes to act and does so negligently."

¶ 21. *Nischke* itself relied on the RESTATEMENT (SECOND) OF TORTS § 323 (1965), which requires that one of two conditions be met for liability: that the defendant's failure to exercise reasonable care increases the risk of harm to the plaintiff, or the harm is suffered because of the plaintiff's reliance upon the defendant's

824

undertaking. *Nischke*, 187 Wis. 2d at 113–14. The plaintiffs do not address whether either of these conditions is met here. Further, the plaintiffs provide nothing by way of evidence or argument to support their bald assertion that, by forming MSGRG, the Generators were voluntarily assuming a duty to the surrounding landowners to protect their groundwater from vinyl chloride contamination. The Generators are members of MSGRG because they are PRPs—those who have been identified as contributing "hazardous waste" to the landfill. *See* 42 U.S.C.A. § 9607(a)(3) (West 2006). They have a legal responsibility under CERCLA to conduct or pay for the cleanup of the site, but this does not mean that they admit to having put vinyl chloride or its chemical precursors into the landfill. Nor does it mean that they have agreed to assume all liability to any potential plaintiff for any and all ill effects the landfill might bring about.

¶ 22. The plaintiffs' last theory of liability is that the Generators violated a duty to warn them about the spread of vinyl chloride contamination. Wisconsin does not categorically exclude the possibility of tort liability based upon an affirmative duty to protect another person, including a duty to warn, even in the absence of a "special relationship." *See Gritzner v. Michael R.*, 2000 WI 68, ¶¶ 21–23, 235 Wis. 2d 781, 611 N.W.2d 906. However, public policy may preclude recovery for such claims, just as with any other negligence claim. *Id.*, ¶¶ 24–26. The six factors courts consider in deciding whether to cut off liability are: (1) the injury is too remote from the negligence, (2) the injury is too wholly out of proportion to the tortfeasor's culpability, (3) in retrospect it appears too highly extraordinary that the negligence should have resulted in the harm, (4) allow-

ing recovery would place too unreasonable a burden on the tortfeasor, (5) allowing recovery would be too likely to open the way for fraudulent claims, and (6) allowing recovery would enter a field that has no sensible or just stopping point. *Id.*, ¶ 27.

¶ 23. Like the plaintiffs' other theories, this one suffers from a paucity of evidence. The plaintiffs assert that

> [i]t is undisputed that at least by 1996, when they joined MSGRG . . . the Generators knew or reasonably should have known that the contamination was spreading downgradient from the landfill to off-site properties.

> [i]t is reasonable to infer that at least by that point, the Generators knew or should have known that the contamination was migrating downgradient, yet failed to warn . . . .

Yet in support of this claim the plaintiffs cite only their expert's report, which itself states only general conclusions and opinions for which it does not provide a factual basis. The Generators vigorously dispute that there was any reason to think that the plaintiffs' properties were at risk at any time before the testing in 1997, after which the plaintiffs were warned, by letter, of the situation.

¶ 24. But even if the plaintiffs could provide some evidence of the Generators' knowledge or constructive knowledge of the vinyl chloride contamination, public policy considerations would preclude recovery on this theory. Again, the Generators are involved in MSGRG because the landfill is the subject of state and federal cleanup laws and procedures. As we have discussed, there is no evidence that any of the defendant Genera-

tors is responsible for the vinyl chloride in the plaintiffs' wells. If the plaintiffs' theory of recovery were allowed, any PRP in a CERCLA cleanup would have an affirmative duty at all times to notify all persons who might potentially be harmed in any way by the area under cleanup. This would be true regardless of that particular party's responsibility for causing the harm. We conclude that this would place an unreasonable burden on PRPs and would enter a field with no sensible or just stopping point. *See id.* Further, it would provide a disincentive for PRPs to cooperate with the government in cleanup efforts. The plaintiffs' "failure to warn" theory is contrary to public policy.

¶ 25. The plaintiffs finally claim that as a result of their exposure to vinyl chloride, they are afraid that they will develop cancer and that they are entitled to compensation for this fear. They cite *Babich v. Waukesha Memorial Hospital, Inc.*, 205 Wis. 2d 698, 556 N.W.2d 144 (Ct. App. 1996). In *Babich*, a patient in a hospital was stuck by a hypodermic needle left in her bed. *Id.* at 701. The patient (along with her husband) sued the hospital, claiming emotional distress in the form of fear that she had been infected with HIV. *Id.* at 701–02. This court affirmed a grant of summary judgment against the plaintiffs. *Id.* at 702. We adopted a "contaminated source" rule limiting such claims: we held that the victim of a needlestick must provide evidence that the needle came from a "contaminated source" before he or she can sustain an emotional distress claim for fear of HIV. *Id.* at 706–07.

¶ 26. The plaintiffs seize on the words "contaminated source" and seem to believe that *Babich* means that their "cancer-fear" claims are valid as a matter of law, because their groundwater constitutes a "contami-

nated source" of water. We note that the analysis in *Babich*, by its own terms, is specific to needlesticks and HIV. We reached the result in that case by considering the public policy factors for cutting off liability in negligence cases. *See id.* at 707–09. Simply identifying an object in any given case and labeling it a "contaminated source" ignores these public-policy factors. Further, as we have discussed above, the plaintiffs have produced no evidence that the Generators had anything to do with the vinyl chloride contamination in their wells. Having failed to show causation, the plaintiffs cannot receive damages, whether for physical harm to their property or for emotional distress.

## Abuse-of-Process Claim; Nonfinal Order

¶ 27. There is one last issue we must address. During discovery, Waste Management learned that Plaintiff Russell Moeller had, at some point, deposited waste at the landfill and had done so after hours. Waste Management sued Moeller for trespass, and also for contribution in the event that Waste Management was held liable in the plaintiffs' suit. Moeller responded to this suit with a motion for summary judgment, and also filed a complaint alleging abuse of process, claiming that Waste Management's suit was intended to "intimidate and/or deter [Moeller] from pursuing his own claims." The circuit court apparently consolidated these cases, as they share a caption in the record and were heard in the same proceeding and decided by the same order. Along with the summary judgment dismissing the Generators, the circuit court granted summary judgment dismissing both Waste Management's claims against Moeller and Moeller's abuse of process claim against Waste Management.

¶ 28. The plaintiffs argue on appeal that the circuit court erred in dismissing the abuse of process claim; the Generators contend that the summary judgment was proper and should be affirmed. We conclude, however, that we lack jurisdiction to address it. This court always has a duty to resolve, even sua sponte, the question of whether it has jurisdiction over an issue on appeal. *See Worthington v. Farmers Ins. Exch.*, 64 Wis. 2d 108, 109, 218 N.W.2d 373 (1974). To be appealable as of right, an order must be final, and to be final, an order must "dispose[] of the entire matter in litigation as to one or more of. the parties." WIS. STAT. § 808.03(1). Moeller's other claims against Waste Management remain pending in the circuit court, and so the dismissal of his abuse of process claim does not dispose of the litigation as to either Moeller or Waste Management. An order is not final as to a particular defendant merely because the order is final as to other defendants. *See Culbert v. Young*, 140 Wis. 2d 821, 825, 412 N.W.2d 551 (Ct. App. 1987).

¶ 29. With the exception of the abuse of process claim, which we do not consider, we affirm the trial court in all respects. We further order that, within thirty days of remittitur, the plaintiffs account to the circuit court for any copies of the attorney-client memo that they may presently have in their possession.

*By the Court.*—Order affirmed and cause remanded with directions.