COURT OF APPEALS
DECISION
DATED AND FILED

February 8, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP598**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV394

IN COURT OF APPEALS
DISTRICT III

JOHN BERMAN,

    PLAINTIFF-APPELLANT,

  V.

NORTHERN CUSTOM ROOFING, INC.,

    DEFENDANT,

OVERHEAD SOLUTIONS, INC. AND PAUL COLLINS,

    DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Brown County: THOMAS J. WALSH, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1　PER CURIAM. This appeal involves a dispute that arose after John Berman sold his roofing company, Northern Home Improvement of WI & MI, LLC ("Northern Home Improvement"), to Northern Custom Roofing, Inc. ("Northern Custom"). Northern Custom is a subsidiary of Overhead Solutions, Inc. ("Overhead"), a company owned by Paul Collins. Berman sued Northern Custom for breach of contract, and he also asserted claims against Collins and Overhead for tortious interference with contract and for conspiracy under WIS. STAT. § 134.01 (2019-20).[1] In addition, Berman sought to pierce Northern Custom's corporate veil to hold Overhead and Collins liable for Northern Custom's alleged breach of contract. Northern Custom, in turn, asserted various counterclaims against Berman.

¶2　The circuit court denied Berman's motion for summary judgment on his breach of contract claim against Northern Custom, and it also denied Northern Custom's motion for summary judgment on its counterclaim for breach of contract against Berman. The court granted summary judgment to Berman, however, on Northern Custom's remaining counterclaims, and it also granted Collins and Overhead summary judgment on Berman's claims for tortious interference with contract and conspiracy. The court declined Berman's request to pierce Northern Custom's corporate veil. As such, the court entered a final order dismissing Collins and Overhead from the case.

¶3　Berman now appeals, arguing that the circuit court erred by denying his motion for summary judgment on his breach of contract claim against Northern

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

Custom, by granting summary judgment in favor of Collins and Overhead on his remaining claims, and by refusing to pierce Northern Custom's corporate veil. We conclude that we lack jurisdiction to review the court's denial of summary judgment on Berman's breach of contract claim against Northern Custom because the court's order denying summary judgment on that claim was not a final, appealable order with respect to Northern Custom. We further conclude that the court properly granted summary judgment to Collins and Overhead on Berman's remaining claims, and that the court did not erroneously exercise its discretion by denying Berman's request to pierce Northern Custom's corporate veil. We therefore affirm.

## BACKGROUND

¶4 Berman began working in construction in 1978, specializing in roofing. He initially ran his business as a sole proprietorship, but at some point he formed Northern Home Improvement, a limited liability company. In 2014, Berman and Collins began discussing the possibility of Collins purchasing Northern Home Improvement. Collins ultimately created Northern Custom for the purpose of purchasing Northern Home Improvement. On March 9, 2016, in his capacity as president of Overhead, Collins executed an "Agreement to Subscribe for Shares of [Northern Custom]." On March 15, Overhead filed a Form 8869 "Qualified Subchapter S Subsidiary Election" with the Internal Revenue Service, by which it elected to treat Northern Custom as a qualified subchapter S subsidiary of Overhead.

¶5 Three days later, on March 18, 2016, Northern Custom entered into an Asset Purchase Agreement ("APA") with Northern Home Improvement and Berman. Neither Overhead nor Collins was a party to the APA. The APA

provided that at the time the transaction closed, Berman would be entitled to a "closing payment" of $250,000. Thereafter, Berman would be entitled to eight "earn out" payments, which would be due every six months from August 15, 2017, until February 15, 2021. As relevant here, each earn out payment would be the lesser of: (1) $50,000; or (2) fifty percent of Northern Custom's "adjusted gross profit" for the applicable six-month earn out period.

¶6      The APA stated that each earn out payment "shall be accompanied by such information as may reasonably allow [Berman] to determine the accuracy thereof." The APA further provided that Berman would be entitled "to conduct periodic audits, during [Northern Custom's] normal business hours, as [Berman] may deem necessary to confirm calculation of each installment payment of Earn Out Consideration."

¶7      Following the execution of the APA, Northern Custom and Overhead maintained separate QuickBooks files, had separate vehicles and financial reporting systems, and entered into contracts separately, including contracts between one another. The two companies also maintained separate telephone numbers, and jobs were assigned to the relevant company based on which phone number the customer called. In addition, insurance payments were allocated between the two companies based on their respective business activities, numbers of employees, and risk factors.

¶8      Berman received two earn out payments of $50,000 for the year 2017, and he received a third earn out payment of $50,000 for the first half of 2018. Berman did not, however, receive any further earn out payments. In November 2019, Northern Custom's attorney sent Berman a letter indicating that Northern Custom's board of directors and shareholder had determined that it was

necessary to discontinue Northern Custom's operations as a result of the company's poor financial performance. The letter further asserted that Berman's earn out payments for the years 2017 and 2018 had been overpaid by $141,172.69.

¶9      In February 2020, Northern Custom's attorney sent a second letter asserting that after Berman's cumulative overpayment for the years 2017 and 2018 was "set off" against his earn out consideration for the year 2019—which Northern Custom had calculated to be $33,063.73—Berman owed Northern Custom $108,108.95. Northern Custom formally demanded that Berman repay that amount within thirty days.

¶10      Berman did not repay the amount demanded by Northern Custom. Instead, in March 2020, Berman filed the instant lawsuit against Northern Custom, Overhead, and Collins (collectively, "the Defendants"). The complaint alleged that Northern Custom had breached its contractual obligations to Berman, and that Overhead and Collins had tortiously interfered with Northern Custom's contract with Berman. Berman later clarified that he was also asserting a claim that Collins and Overhead had conspired with Collins' wife and with Northern Custom's financial controller, Nicole Boucher, to willfully or maliciously injure Berman in his trade or business, contrary to WIS. STAT. § 134.01.[2] Berman sought an award of damages, as well as an order "piercing the corporate veil of [Northern Custom] and ordering that all Defendants are jointly and severally liable for any and all judgments obtained by [Berman] against [Northern Custom]."

---

[2] The record reflects that Boucher was technically employed by Royal Montessori Academy, another company owned by the Collins family. However, Boucher testified that she served as financial controller for all of the Collins family's companies, including Northern Custom.

¶11    The Defendants filed an answer to Berman's complaint, and Northern Custom also asserted counterclaims against Berman for breach of contract, breach of the duty of good faith and fair dealing, conversion, and civil theft.  The Defendants later moved for summary judgment on all of Berman's claims and on Northern Custom's counterclaims.  Berman opposed the Defendants' summary judgment motion and also asked the circuit court to grant partial summary judgment in his favor on his breach of contract claim against Northern Custom and on Northern Custom's counterclaims against him.

¶12    On March 10, 2021, the circuit court issued a written order denying Berman's and Northern Custom's cross-motions for summary judgment on their respective breach of contract claims.  The court granted summary judgment in favor of Collins and Overhead on Berman's remaining claims, however, and it also granted summary judgment in favor of Berman on Northern Custom's remaining counterclaims.  The court denied Berman's request to pierce Northern Custom's corporate veil.

¶13    Consistent with its March 10 order, on March 25, 2021, the circuit court entered a written order dismissing Collins and Overhead from the case with prejudice and amending the caption to remove them as defendants.  Berman now appeals from the court's March 25 order.  Additional facts are included below as necessary.

**DISCUSSION**

¶14    We review a circuit court's grant or denial of summary judgment independently, using the same methodology as the circuit court.  *See AccuWeb, Inc. v. Foley & Lardner*, 2008 WI 24, ¶16, 308 Wis. 2d 258, 746 N.W.2d 447. Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).

## I. Breach of contract

¶15 Berman first argues that the circuit court erred by failing to grant summary judgment in his favor on his breach of contract claim against Northern Custom. He asserts the undisputed facts established, as a matter of law, that Northern Custom breached the APA by failing to properly pay his earn out payments and failing to provide him with required financial information to support its earn out determinations.

¶16 We lack jurisdiction to consider this argument because the circuit court's order denying summary judgment on Berman's breach of contract claim was not a final order with respect to Northern Custom. "A final judgment or a final order of a circuit court may be appealed as a matter of right to the court of appeals unless otherwise expressly provided by law." WIS. STAT. § 808.03(1). We have no jurisdiction over an appeal as of right brought from a nonfinal judgment or order. *L. G. v. Aurora Residential Alts., Inc.*, 2019 WI 79, ¶9, 387 Wis. 2d 724, 929 N.W.2d 590. Whether a judgment or order is final for purposes of appeal is a question of law that we review independently. *Wambolt v. West Bend Mut. Ins. Co.*, 2007 WI 35, ¶14, 299 Wis. 2d 723, 728 N.W.2d 670.

¶17 As relevant here, a judgment or order is final if it "disposes of the entire matter in litigation as to one or more of the parties." WIS. STAT. § 808.03(1). However, "[a]n order is not final as to a particular defendant merely because the order is final as to other defendants." *Dyer v. Blackhawk Leather LLC*, 2008 WI App 128, ¶28, 313 Wis. 2d 803, 758 N.W.2d 167.

¶18 In this case, the circuit court's order denying Berman's summary judgment motion on his breach of contract claim against Northern Custom was not a final order as to Northern Custom, as it did not dispose of the entire matter in litigation with respect to Northern Custom. Following the order's issuance, both Berman's breach of contract claim against Northern Custom and Northern Custom's breach of contract counterclaim against Berman remained for trial. Although the court subsequently entered an order dismissing Collins and Overhead from the case and amending the caption to remove them as defendants, Northern Custom was not dismissed and remained a party. As such, the court's order denying summary judgment on Berman's breach of contract claim was not a final order as to Northern Custom and could not be appealed as of right under WIS. STAT. § 808.03(1).

¶19 An order or judgment that is not appealable as of right may be appealed in advance of a final judgment or order only if this court grants a party leave to appeal it. WIS. STAT. § 808.03(2). To seek leave to appeal, a party must file a petition and supporting memorandum within fourteen days after the judgment or order is entered. WIS. STAT. RULE 809.50(1). Berman did not file a timely petition—or, indeed, any petition—seeking leave to appeal the circuit court's nonfinal order denying summary judgment on his breach of contract claim.

¶20 In his reply brief, Berman nevertheless argues that we have jurisdiction to review the order in question because WIS. STAT. RULE 809.10(4) states that "[a]n appeal from a final judgment or final order brings before the court all prior nonfinal judgments, orders and rulings adverse to the appellant and favorable to the respondent made in the action or proceeding not previously appealed and ruled upon." Berman asserts that under this statute, his appeal from the circuit court's final order dismissing Collins and Overhead from the case

brought before us the court's prior nonfinal order denying summary judgment on his breach of contract claim against Northern Custom.

¶21 This argument fails because WIS. STAT. RULE 809.10(4) expressly refers to prior nonfinal judgments, orders, and rulings that are "adverse to the appellant *and favorable to the respondent*." (Emphasis added.) Northern Custom is not a respondent in this appeal. Thus, while RULE 809.10(4) permits Berman to challenge in this appeal any prior nonfinal orders that are adverse to him and favorable to Collins and Overhead, it does not permit him to challenge the circuit court's nonfinal order denying him summary judgment on his breach of contract claim against Northern Custom. *See Commerce Bluff One Condo. Ass'n v. Dixon*, 2011 WI App 46, ¶¶8-9, 332 Wis. 2d 357, 798 N.W.2d 264 (rejecting the appellants' argument that RULE 809.10(4) permitted them to challenge a nonfinal order that was adverse to the appellants and favorable to parties who were not named as respondents in the appeal).

¶22 For all the foregoing reasons, we conclude we lack jurisdiction to consider Berman's argument that the circuit court erred by denying his motion for summary judgment on his breach of contract claim against Northern Custom. Accordingly, we will not further address that argument.

## II. Tortious interference with contract

¶23    Berman also argues that the circuit court erred by granting the Defendants summary judgment on his tortious interference with contract claim.[3] Berman asserts that he presented sufficient evidence to establish, as a matter of law, that Collins tortiously interfered with Berman's contractual relationship with Northern Custom by altering Northern Custom's "accounting and expense reporting to avoid Berman's Earn Out payments[,] contrary to the APA."

¶24    As discussed above, the APA required Northern Custom to make eight earn out payments to Berman, each of which would be the lesser of $50,000 or fifty percent of Northern Custom's "adjusted gross profit" for the applicable six-month earn out period.  The APA defined "adjusted gross profit" as "[Northern Custom's] gross sales, less [Northern Custom's] cost of sales (including material and direct labor), less any gross salary paid to John T. Berman pursuant to the Employment Agreement,[4] and less an overhead allowance equal to ten percent (10%) of gross sales."

¶25    It is undisputed that Northern Custom paid Berman $50,000 for each of the first three earn out payments.  Berman asserts, however, that after the third earn out payment was made, Northern Custom's financial controller, Nicole

---

[3] In his complaint, Berman alleged that both Collins and Overhead had tortiously interfered with his contract with Northern Custom.  In his response to the Defendants' summary judgment motion, however, Berman argued only that Collins had tortiously interfered with that contract.  Similarly, on appeal, Berman frames his tortious interference claim as pertaining to Collins alone.  We therefore limit our discussion to whether the circuit court properly determined that Collins was entitled to summary judgment on the tortious interference claim.

[4] The APA included a five-year employment agreement between Berman and Northern Custom.  Under the employment agreement, Berman was entitled to a gross base salary of $5,000 per month.

Boucher, "began to manipulate Northern Custom's internal financial reporting to change the way the 'cost[] of sales' were calculated for Berman's Earn Out consideration." In particular, Berman notes that Boucher testified she included a "whole bunch of expenses" under Northern Custom's cost of sales that had not been included previously. Berman contends that by doing so, Boucher ignored the APA's "express definition of 'cost[] of sales' as solely including materials and direct labor." Berman further asserts that this "overhaul of Northern Custom's financial reporting … was not similarly utilized to manipulate Overhead's books."

¶26     In addition, Berman contends that Boucher and Collins' wife, Tara Collins,[5] "deleted entries in Northern Custom's books and created numerous unexplained charges and expenses that further made Northern Custom appear even less profitable." Berman also contends that Tara "stopped tracking details for expenses charged to Northern Custom in 2019, despite keeping track of that detail for both companies previously and continuing to do so for Overhead." He argues this practice "avoided accountability and directly violated the APA's requirement that Northern Custom maintain adequate records and provide a detailed explanation for the Earn Out calculation."

¶27     Finally, Berman asserts that "numerous deletions" were made to Northern Custom's accounting records after its attorneys notified Berman in November 2019 that Northern Custom had overpaid his previous earn out payments. Berman contends these deletions "were backdated to reduce Berman's Earn Out in prior years and included entries changing previously reported income

---

[5] Because Collins and his wife share a surname, we refer to Tara Collins by her first name throughout the remainder of this opinion.

and losses, without accompanying amended tax returns." Although Collins claimed to have no knowledge of these deletions, Berman suggests that he must have known about them because his wife was the person who made them. Berman argues these facts establish, as a matter of law, that Collins intentionally interfered with Northern Custom's contractual obligation under the APA to make earn out payments to Berman.

¶28 To prevail on a tortious interference with contract claim, a plaintiff must prove five elements:

> (1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere.

*Briesemeister v. Lehner*, 2006 WI App 140, ¶48, 295 Wis. 2d 429, 720 N.W.2d 531. In this case, the parties agree that the first of these elements was satisfied because it is undisputed that Berman had a contract with Northern Custom—i.e., the APA. The Defendants argue, however, that the undisputed facts show that Berman cannot satisfy the remaining four elements. We conclude, based upon the undisputed facts, that Berman cannot establish the second and third elements of his tortious interference claim—that is, that Collins interfered with Berman's contractual relationship with Northern Custom, and that his interference was intentional. As such, we need not address the fourth and fifth elements. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (court of appeals decides cases on the narrowest possible grounds).

¶29     As noted above, Berman asserts that Collins interfered with his contractual relationship with Northern Custom by altering "Northern Custom's accounting and expense reporting to avoid Berman's Earn Out payments[,] contrary to the APA." The undisputed evidence establishes, however, that the conduct Berman complains of was not attributable to Collins. In an affidavit submitted in support of the Defendants' summary judgment motion, Boucher averred that she served as the financial controller for Overhead and Northern Custom from September 2017 until October 2020. During her deposition, Boucher testified that in her role as controller, she was responsible for "overseeing the numbers, producing financial statements, assisting with the preparation of the year-end tax return," and "complet[ing] payroll and associated payroll reporting." Boucher also testified that part of her responsibility as controller was to "verify all of our liability balances," which included Northern Custom's obligation under the APA to make earn out payments to Berman.

¶30     Boucher explained that during the years 2017 and 2018, she was "still pretty new to the company," and she therefore did not realize that she should verify whether the $50,000 earn out payments made to Berman during those years had been calculated correctly. In January 2019, however, while completing Northern Custom's year-end financials for 2018, Boucher decided to conduct an evaluation of the company's liability balance with respect to Berman so that she could support that obligation on the company's balance sheet. Boucher testified that she engaged in this investigation independently, without any direction from Collins. No one came to her and said, "I don't want to have to pay this obligation anymore. Can you create a calculation to tell me if I owe it or not?" Boucher further testified that when she began her investigation into the earn out payments in January 2019, she did not know it would lead to a conclusion that Berman was

13

not entitled to further earn out payments, and that result was "not the intention of the exercise."

¶31 Boucher explained that when she began investigating the earn out payments, she reviewed the language in the APA describing how those payments were to be calculated. The earn out calculation requires a determination of Northern Custom's "cost of sales," however, and Boucher was unsure how that cost should be determined. She therefore approached Collins and Tara and "asked if they could help me understand the earn[ ]out and the detail behind it." Collins and Tara "didn't understand the specifics of the earn[ ]out calculation," and they suggested that Boucher contact an attorney for assistance.

¶32 Boucher ultimately contacted Jason Kiehnau at the accounting firm CliftonLarsenAllen for assistance in understanding the earn out calculation. Kiehnau reviewed Northern Custom's profit and loss statement with Boucher and told her which items CliftonLarsenAllen would include within the term "cost of sales." Based on her consultation with Kiehnau, Boucher determined that "cost of sales" should include: (1) workers compensation and general liability insurance; (2) automobile expenses; and (3) warranty/permit costs. After performing the earn out calculation with those items included in Northern Custom's "cost of sales," Boucher determined that Berman's earn out payments in 2017 and 2018 had been overpaid by $141,172.68. Boucher further determined that Berman was entitled to earn out payments totaling $33,063.73 for the year 2019. After deducting that amount from the prior overpayments, Boucher concluded that Berman owed Northern Custom $108,108.95.

¶33 During his deposition, Collins confirmed that that he did not direct Boucher to investigate the method used to calculate Berman's earn out payments.

He testified that doing so was Boucher's job, and he had never personally considered what categories of expenses should be included in the earn out calculation. Collins also testified that to the extent deletions were made from Northern Custom's accounting records beginning in October 2019, he had "no idea" why that was done. Boucher testified the deletions occurred because when a mistake is made regarding a particular transaction in QuickBooks, "you cannot fix the underlying transaction until you delete the deposit."

¶34 This undisputed evidence establishes that the actions Berman complains of were not undertaken either by Collins or at Collins' direction. Instead, Boucher independently decided to investigate the method used to calculate Berman's earn out payments, and she completed that investigation without any substantive input from Collins. And to determine the proper meaning and accounting of "cost of sales" under the APA, Boucher consulted an independent accounting firm. The evidence also shows that Boucher, not Collins, was responsible for the deletions in Northern Custom's financial records. Berman does not cite any evidence demonstrating—or even raising a reasonable inference—that Collins was responsible for the challenged conduct. The fact that Boucher was a longtime friend of Collins and worked for other companies owned by the Collins family does not refute the uncontroverted evidence, as set forth above, that Boucher independently undertook the actions in question. Although Berman speculates that Collins and Tara colluded with Boucher to deprive Berman of the earn out payments, he cites no actual evidence supporting a reasonable inference that such collusion occurred.

¶35 Under these circumstances, we agree with the circuit court that Berman has failed to raise a genuine issue of material fact as to whether Collins interfered with the contractual relationship between Berman and Northern Custom.

There is no evidence that Collins was responsible for "any conduct or words conveying to [Northern Custom] [Collins'] desire to influence [Northern Custom] to refrain from dealing with [Berman]." *See* WIS JI—CIVIL 2780 (2020). Stated more specifically with respect to the facts of this case, there is no evidence that Collins took any actions to influence Northern Custom to reconsider the manner in which it calculated the earn out payments that were due to Berman under the APA.

¶36 In addition, Berman has failed to raise a genuine issue of material fact as to whether any interference by Collins was intentional. To show that a defendant's interference with a contractual relationship was intentional, a plaintiff must prove that the defendant's "prime purpose" was to interfere with the contractual relationship, or that the defendant knew or should have known that such interference was substantially certain to occur as a result of the defendant's conduct. *See* *id.* Again, the undisputed evidence shows that Boucher independently instigated and conducted the investigation into the calculation of Berman's earn out payments. Moreover, Boucher specifically testified that she did not undertake that investigation with the intent to avoid making the earn out payments, nor did anyone direct her to undertake the investigation for that purpose.[6]

---

[6] Berman cites *Admiral Insurance Co. v. Paper Converting Machine. Co.*, 2012 WI 30, ¶53, 339 Wis. 2d 291, 811 N.W.2d 351, for the proposition that an agent's knowledge is imputed to the agent's principal. That proposition does not help Berman here, however, because the undisputed evidence shows that Boucher conducted an independent investigation into the method of calculating the earn out payments, and that investigation revealed that additional items should be included within Northern Custom's cost of sales. Imputing that knowledge to the principal, Northern Custom, does not in any way establish that Collins intentionally interfered with Berman's contractual relationship with Northern Custom.

¶37     Furthermore, we agree with the circuit court that Northern Custom's eventual demand that Berman repay the amounts that Boucher determined he had been overpaid does not show that Collins intentionally interfered with Northern Custom's contractual relationship with Berman.  As the court aptly noted, it is "not unreasonable that a business owner, upon having their controller tell them they did not owe a particular liability, would not want to pay it or would ask for an overpayment back."

¶38     For all of these reasons, we conclude that in opposition to the Defendants' summary judgment motion, Berman failed to present sufficient evidence to raise a genuine issue of material fact as to whether Collins intentionally interfered with Berman's contractual relationship with Northern Custom.  As such, the circuit court properly determined, as a matter of law, that Berman could not prevail on his tortious interference claim.

## III.  Conspiracy

¶39     Berman next argues that the circuit court erred by granting the Defendants summary judgment on his claim that Collins, Tara, and Boucher conspired to willfully or maliciously injure him in his trade or business, contrary to WIS. STAT. § 134.01.[7]   A claim under § 134.01 requires proof of four elements:  (1) the defendant and others acted together; (2) the defendant and others acted with a common purpose to injure the plaintiff's trade or business; (3) the defendant and others acted maliciously in carrying out the common purpose; and

---

[7]  In the circuit court, Berman alleged that Overhead was also involved in this conspiracy. On appeal, however, Berman argues that only "Collins, his wife, and [Boucher] conspired to injure [him]." (Formatting altered.)  We therefore do not address any possible involvement by Overhead in the alleged conspiracy.

(4) the acts of the defendant and others financially injured the plaintiff. WIS JI—CIVIL 2820 (2008).

¶40 Berman contends a "mountain of circumstantial evidence exists" to show that these elements were satisfied in the instant case. In support, he asserts—without citation to the record:

> The fact that Collins[] mysteriously claims to have no knowledge of his business' convenient accounting changes directed to put an end to Berman's Earn Out payments, after he directed the first three payments to be made, that he provided contradictory testimony about his wife's involvement in the manipulation of accounts done solely to benefit him to avoid Northern Custom's Earn Out obligation, the hiding of these changes from Berman until formal discovery, the excessive costing of Northern Custom jobs effectuated through manipulation of Northern Custom's books by his wife, and the refusal to address any of this after all of it was brought to light, all tends to show malicious intent. Collins, his wife, and [Boucher], all conspired to intentionally interfere with and eliminate Berman's Earn Out payments.

Stated differently, Berman asserts that he presented enough circumstantial evidence on each of the elements of his conspiracy claim to raise reasonable inferences regarding those elements, and that those reasonable inferences were sufficient to create genuine issues of material fact necessitating a trial.

¶41 We disagree. While circumstantial evidence giving rise to reasonable inferences is generally sufficient to survive summary judgment and necessitate a trial, "Wisconsin law in respect to conspiracies imposes a more stringent test." *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 162 Wis. 2d 73, 84, 469 N.W.2d 629 (1991). "To prove a conspiracy, a plaintiff must show more than a mere suspicion or conjecture that there was a conspiracy or that there was evidence of the elements of a conspiracy." *Id.* Thus, "if circumstantial evidence

supports equal inferences of lawful action and unlawful action, then the claim of conspiracy [under WIS. STAT. § 134.01] is not proven." *Id.* at 85 (citation omitted). Under those circumstances, "the matter at issue should not be submitted to the jury." *Id.*

¶42 As explained above, Boucher's undisputed testimony in this case shows that she independently decided to investigate the method of calculating Berman's earn out payments. She conducted her investigation with the help of an outside accounting firm, and without any substantive input from Collins or Tara. Moreover, Boucher specifically testified that her "intention" in conducting the investigation was not to avoid paying Berman his earn out payments. To the contrary, Boucher testified that as Northern Custom's controller, it was her responsibility to verify all of the company's liability balances, which included its obligation to Berman. Berman does not cite any evidence disputing Boucher's testimony in this regard.

¶43 Additionally, during her deposition testimony, Boucher explained why certain deposits were deleted from Northern Custom's financial records beginning in October 2019. Berman cites nothing other than circumstantial evidence to support his claim that the deletions were instead made for the nefarious purposes of depriving him of his earn out payments and preventing him from investigating the accuracy of Northern Custom's earn out calculations.

¶44 Moreover, we agree with the Defendants that the record is "entirely void of any evidence to show that Collins's wife, Tara, was acting with the requisite level of malice to sustain a claim for conspiracy." Throughout his appellate briefs, Berman makes a variety of accusations against Tara without providing any evidence to support them. For instance, at one point in his brief-in-

chief, Berman states that Tara "created numerous inflated expenses and withheld credits to take even more money from Northern Custom." The portion of the appellate record that Berman cites in support of this proposition, however, merely states: "Corporate officer Tara … made more than half of the accounting entries in Overhead Solutions, made over a third of the accounting entries in Northern Home Improvement, and she made all of the related-party transaction entries for both companies." This evidence merely shows that Tara made accounting entries for the companies in question. Berman cites no evidence that these entries were made in collusion with Collins or Boucher, that they were made for the purpose of depriving Berman of his earn out payments, or that they were done maliciously.

¶45 Ultimately, the evidence that Berman cites at most gives rise to competing inferences of lawful and unlawful conduct by Collins, Tara, and Boucher. Under these circumstances, the circuit court properly determined that Berman was not entitled to a jury trial on his conspiracy claim. *See Maleki*, 162 Wis. 2d at 84-85.

## IV. Piercing the corporate veil

¶46 Lastly, Berman argues that the circuit court erred by refusing to pierce Northern Custom's corporate veil in order to hold Overhead and Collins liable for Northern Custom's alleged breach of the APA.[8] A corporation is a separate entity from its shareholders and is treated as such under all ordinary circumstances. *Consumer's Co-op of Walworth Cnty. v. Olsen*, 142 Wis. 2d 465,

---

[8] Technically, Berman sought to pierce Northern Custom's corporate veil to hold Overhead liable, and he then further sought to pierce Overhead's corporate veil to hold Collins liable.

474, 419 N.W.2d 211 (1988). Consequently, "[t]he obligations of the corporation are the responsibility of the corporate entity, not the shareholders, who are liable only for the amount they voluntarily put 'at risk' in the business venture." *Id.* (citation omitted). Notwithstanding this general rule, however, there exist certain circumstances in which a court may "disregard[] the corporate fiction" and "pierc[e] the corporate veil" in order to hold shareholders liable for a corporation's obligations. *Id.* at 475.

¶47 Piercing the corporate veil is an equitable remedy and is therefore reviewed for an erroneous exercise of discretion. *Id.* at 472. As such, even though this case is before us on review of the circuit court's summary judgment ruling, we will not reverse unless the court erroneously exercised its discretion by denying Berman's request to pierce Northern Custom's corporate veil. *See Michels Corp. v. Haub*, No. 2012AP165, unpublished slip op. ¶7 (WI App Aug. 30, 2012) (reviewing a circuit court's summary judgment ruling on a claim to pierce the corporate veil for an erroneous exercise of discretion).[9] A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a demonstrated rational process to reach a reasonable conclusion. *LeMere v. LeMere*, 2003 WI 67, ¶13, 262 Wis. 2d 426, 663 N.W.2d 789.

¶48 Under the "instrumentality" or "alter ego" doctrine, the corporate veil may be pierced if the plaintiff proves the following elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy

---

[9] An unpublished opinion authored by a member of a three-judge panel and issued on or after July 1, 2009, may be cited for its persuasive value. WIS. STAT. RULE 809.23(3)(b).

and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

***Consumer's Co-op***, 142 Wis. 2d at 484 (citation omitted). "[F]ailure to follow corporate formalities is a factor relevant to the first element, whereas inadequate capitalization is primarily significant with respect to whether control has been exercised in such a manner as to result in injustice." ***Id.*** at 485. While undercapitalization is significant, it is not "an independently sufficient ground to pierce the corporate veil." ***Id.*** at 482.

¶49    With respect to the first element, the evidence in this case does not establish that Collins or Overhead exercised the requisite control over Northern Custom to justify piercing its corporate veil. Berman has not cited any evidence that these parties ignored or failed to follow corporate formalities.

¶50    To the contrary, the record shows that Overhead and Northern Custom were created at separate times, and with the requisite formalities. The record further shows that after Northern Custom was created, Overhead executed a formal agreement to subscribe for Northern Custom's shares. Thereafter, Overhead and Northern Custom maintained separate QuickBooks files, had separate vehicles and financial reporting systems, and entered into agreements separately, including agreements with each other. The two companies also maintained separate telephone numbers, and jobs were assigned between the companies based on which phone number the customer called. In addition,

insurance payments were allocated between the two companies based on their respective business activities, numbers of employees, and risk factors. Berman has not cited any evidence—as opposed to mere speculation—that Collins attempted to manipulate the two companies' corporate structures or that he disregarded the separation between the two companies or between the companies and himself.

¶51 Berman has also failed to show that Collins or Overhead used any control that they exercised over Northern Custom to commit a fraudulent, wrongful, or unjust act. Again, the record shows that Boucher, in her capacity as Northern Custom's controller, independently decided to investigate the method of calculating Berman's earn out payments. There is no evidence that either Collins or Overhead directed her to do so. Moreover, while Berman asserts that Northern Custom was undercapitalized, the circuit court reasonably determined that was not the case, as Northern Custom had acquired Northern Home Improvement's assets shortly after its formation. In any event, the court also correctly noted that undercapitalization is not dispositive of whether an entity's corporate veil should be pierced. *See Consumer's Co-op*, 142 Wis. 2d at 482.

¶52 Finally, Berman has failed to show that he suffered any harm or damage as a proximate cause of Collins' or Overhead's alleged control of Northern Custom. Berman contends that he was harmed because he has not received all of the money to which he was entitled under the APA. Specifically, he asserts that certain expenses were erroneously included in Northern Custom's "cost of sales," which resulted in Northern Custom improperly reducing the amount of Berman's earn out payments. These alleged damages, however, do not relate to a misrepresentation of the corporate form or a failure to observe the

requisite corporate formalities. Rather, they relate to changes in Northern Custom's internal financial practices.

¶53 Berman relies on *Avco Delta Corp. Canada v. United States*, 540 F.2d 258 (7th Cir. 1976), to support his argument that the circuit court should have pierced Northern Custom's corporate veil. *Avco*, however, did not apply Wisconsin law and is not binding authority. Consequently, it is of little aid to our analysis.

¶54 Berman also cites *Sprecher v. Weston's Bar, Inc.*, 78 Wis. 2d 26, 253 N.W.2d 493 (1977), but that case is factually distinguishable. *Sprecher* involved a dispute between landlords (the Sprechers) and a tenant (Weston's Bar) regarding the transfer of a liquor license from the landlords' property to a property owned by the tenant's shareholders, Julia and Cyril Weston (the Westons). *Id.* at 30-32. The Sprechers sued both Weston's Bar and the Westons, alleging a breach of the bar's lease and seeking damages. *Id.* at 32-33.

¶55 The circuit court determined that the Westons could be held personally liable for the bar's breach of the lease, and the supreme court affirmed. *Id.* at 33, 39. The supreme court relied on the circuit court's factual findings that: (1) the Westons had "complete control and domination" of Weston's Bar; (2) the Westons made no serious attempt to hold corporate meetings or maintain records of corporate meetings; (3) Weston's Bar had no substantial assets, and the Westons had taken out "basically all of the corporate profits" in salary; (4) the Westons were responsible for transferring the liquor license from the Sprechers' building to a building that the Westons personally owned; and (5) in doing so, the Westons "acted more for the protection of their individual interest than in the protection of the corporation." *Id.* at 38-39.

¶56    The circuit court did not make any similar factual findings in this case. In particular, the court did not find either that Collins and Overhead had complete control and domination over Northern Custom, or that no serious attempts were made to hold corporate meetings or maintain records of such meetings. In addition, as discussed in detail above, the evidence would not support a finding that either Collins or Overhead was responsible for the recalculation of Berman's earn out payments, which instead occurred as a result of Boucher's independent investigation. As such, several of the factors that prompted the court to pierce the corporate veil in *Sprecher* are not present here.

¶57    Berman also asserts that the circuit court should have pierced Northern Custom's corporate veil because of the "parent-subsidiary" relationship between Northern Custom and Overhead. Berman lists fifteen factors that he asserts should be considered "in deciding if a parent controls its subsidiary to such an extent that the separate corporate identity of the subsidiary should be disregarded." *See Cemetery Servs., Inc. v. Department of Regul. & Licensing*, 221 Wis. 2d 817, 827, 586 N.W.2d 191 (Ct. App. 1998).

¶58    Berman does not explain, however, how these fifteen factors would support piercing Northern Custom's corporate veil in the instant case. Instead, he merely asserts—within further elucidation or citation to the appellate record—that he has "presented facts that would support a finding in his favor on each of these factors weighing in favor of piercing the subsidiary['s] veil." Berman's argument regarding the parent-subsidiary relationship between Overhead and Northern Custom is therefore undeveloped, and we decline to address it further. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

¶59 In all, Berman has failed to show that the circuit court erroneously exercised its discretion by declining to pierce Northern Custom's corporate veil. We therefore affirm the court's order dismissing Overhead and Collins from this lawsuit.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.